UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:09-CR-72 |
| | ) | (VARLAN/SHIRLEY) |
| DAVID W. SHARP, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the District Court, as may be appropriate. The Defendant is charged in a one-count Indictment [Doc. 1] with possession with the intent to distribute of 50 grams or more of a mixture and substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B).

On July 27, 2009, the Defendant, through counsel, filed a Motion to Suppress [Doc. 11] all statements that he made or is alleged to have made and all evidence obtained in this case, including all illegal contraband uncovered during a search of the Defendant and his vehicle. This motion alleges that there was no legal basis for the search of the Defendant's vehicle or for the holding of the Defendant at the scene of his arrest for a period of time until a drug dog was brought to sniff the vehicle. The Government responds that: (A) the search of the Defendant's vehicle was supported by probable cause provided by the drug dog's alert on the vehicle; (B) the K-9 team was lawfully present at the scene of the Defendant's arrest; (C) the drug dog sniff was not itself a search of the

Defendant's vehicle within the meaning of the Fourth Amendment; and (D) the holding of the Defendant at the scene of his arrest until the canine team arrived was lawful because the Defendant was not "detained" within the meaning of Terry v. Ohio, 392 U.S. 1 (1968), as he had already been arrested and was in custody for the entire period that he was held at the scene. [Doc. 14].

The parties appeared before the Court for a motion hearing on September 4, 2009. Assistant United States Attorney Tracy L. Stone ("AUSA Stone") was present representing the Government. Attorney A. Philip Lomonaco ("Attorney Lomonaco") represented the Defendant, who was also present. At the hearing, the Defendant somewhat modified the argument for suppression presented in his written motion by advancing two legal theories on which the Court could suppress the evidence in this case. First, the Defendant argued that witness testimony proved that police officers searched his car to some degree prior to the dog sniff and that this search violated the Fourth Amendment because it was not a valid search incident to arrest under the holding in Arizona v. Gant, 129 S.Ct. 1710 (April 21, 2009). Second, the Defendant argued that the dog sniff that was performed on his vehicle was conducted improperly and therefore could not have lawfully provided probable cause to justify searching the vehicle pursuant to the automobile exception to the warrant requirement. The Government rejected the Defendant's factual allegations and argued that police officers did not search the Defendant's vehicle *at all* prior to the dog sniff and that there was nothing improper about the way that the sniff was carried out.

At the conclusion of the September 4 hearing, the Defendant made an oral motion for leave to file an additional exhibit. [Tr. 99-100]. The Government had no opposition to the motion and it was granted. [Tr. 100]. Pursuant to the Court's instructions, Deputy Jonathan Acker, a K-9 unit officer with the Anderson County Police Department, delivered the Defendant's additional exhibit,

2

"Packet of K-9 Incident Reports on all positive alerts by canine Belu" [Exhibit 11], to the Court on September 18, 2009. Four days after the suppression hearing, on September 8, 2009, the Government also sought to introduce additional exhibits and therefore filed a Motion for Leave to File Late-Filed Exhibits [Doc. 27]. The Defendant did not object to the motion and it was granted. [Doc. 31]. Accordingly, the Government's additional exhibits, "Incident Details Report" [Doc. 27-1, Exhibit 12] and "Arrestee Intake Form and Uniform Arrest Report" [Doc. 27-2, Exhibit 13], were admitted into evidence on September 23, 2009. [Doc. 31].

## I. FACTS

On March 21, 2009, at sometime between noon and 1:00 p.m., Assistant Chief of Police Greg Woods of the Lake City Police Department recognized the Defendant as he was driving a car alone on Sharpe Drive within the limits of Lake City, TN. Woods was driving his cruiser in the eastbound lane on Sharpe Drive when he passed the Defendant driving a car in the westbound lane heading toward the western dead end of Sharpe Drive. Woods recognized the Defendant's face and recalled that there was an outstanding warrant for the Defendant's arrest on charges of telephone harassment dated February 12, 2009. Woods testified that he was familiar with the Defendant's appearance because he had known him "off and on" for 17 years and because he was familiar with the Defendant's parents' home. [Tr. 32-33].

After driving past the Defendant, Woods parked his cruiser at the corner of Sharpe Drive and Main Street and contacted another Lake City police officer who was on patrol, Officer Mike Nations. Woods asked Nations to join him at the intersection. When Officer Nations arrived, Woods instructed Nations to remain parked at the intersection while he returned to the Lake City police station to obtain a copy of the outstanding warrant for the Defendant's arrest. At some point while

3

waiting for Officer Nations to arrive or while driving to the police station, Woods attempted to contact Deputy Jonathan Acker, a K-9 unit officer with the Anderson County Police Department. Woods apparently was unable to reach Acker initially, but he testified that Acker telephoned him back while he was still at the Lake City police station looking for a copy of the warrant. The specifics of the conversation between Woods and Acker are not clear, but apparently Woods informed Acker that an arrest of the Defendant was likely to occur soon and asked if Acker would be available to conduct a drug dog sniff if necessary. Acker testified that he was training with his drug dog, "Belu," at the Anderson County Jail in Clinton, TN at the time he spoke with Woods. Both Woods and Acker testified that the Anderson County Jail is approximately a 10-15 minute drive from Lake City. [Tr. 23, Tr. 75]. Acker told Woods that he and Belu were training, but were available for deployment if needed.

Woods returned to the corner of Sharpe Drive and Main Street and parked his cruiser next to Nations's cruiser. Woods and Nations intended to wait for the Defendant to drive by their position so that they could then arrest him. Woods and Nations had their cruisers parked side-by-side and facing in opposite directions so that they could observe traffic on Sharpe Drive in both directions. After a short period of time, Nations spotted the Defendant driving eastbound on Sharpe Drive. Nations drove out from his parking spot and followed the route that the Defendant's vehicle had taken from Sharpe Drive onto Wyoming Lane. Nations did not turn on his siren nor did he activate his emergency lights. Nations drove northbound on Wyoming Lane until he saw the Defendant's car parked in the driveway of 123 Wyoming Lane, the home of Gary and Martha Braden. The Defendant's vehicle had been backed into the driveway about 20-25 feet and the front end was pointed toward Wyoming Lane.

4

Officer Nations pulled his cruiser into the driveway next to the Defendant's vehicle and then got out and approached the driver's side of the Defendant's vehicle. Nations testified that the engine of the Defendant's vehicle was turned off and that the Defendant was seated in the driver's seat with the door closed and the window down. Nations testified that he greeted the Defendant through the open car window, informed him of the outstanding arrest warrant, and asked him to step out of the car so that he could be placed under arrest. Nations testified that he handcuffed the Defendant and then requested consent to search the Defendant's vehicle, which was denied. Nations then placed the Defendant in the back of his cruiser. At some point during the arrest or soon after, Assistant Chief Woods arrived and parked his cruiser on Wyoming Lane in front of the Braden's driveway. At some point after the Defendant was placed in the back of Officer Nations's cruiser, Martha Braden came out onto her front porch and observed the activity on her driveway. [Tr. 109].

The specific facts surrounding the subsequent police actions related to the Defendant's vehicle are disputed. What is clear is that sometime between 10 and 30 minutes after the Defendant was placed in Officer Nations' cruiser, Deputy Acker and Belu arrived on the Braden's driveway and conducted a drug detection sniff of the Defendant's parked vehicle.[1] At some point during the sniff, Belu entered the front interior cabin of the Defendant's vehicle. Belu alerted to the front passenger seat of the vehicle and Deputy Acker, possibly assisted by Officer Nations, searched the

---

[1] Martha Braden testified that 20-30 minutes, "at least 20," elapsed from the time that she observed Officer Nations kneeling by the open front passenger side door of the Defendant's vehicle and the time that she saw Deputy Acker arrive with Belu. [Tr. 110]. Officer Nations testified that approximately 10 minutes elapsed between his initial contact with the Defendant and the arrival of Deputy Acker and Belu. [Tr. 47]. Assistant Chief Woods testified that it takes approximately 10 or 15 minutes to drive normally (as opposed to "police driving") from Clinton, where Deputy Acker was training with Belu, to Lake City. [Tr. 23]. Deputy Acker testified, and his Incident Report indicates, that it took him 12 minutes to arrive at the Braden's driveway from the time that he was called and asked to deploy. [Tr. 75, Exhibit 12].

5

vehicle and removed a camouflage shaving kit bag on the front passenger seat containing approximately 154 grams of methamphetamine hydrochloride and 42 grams of marijuana.

Two major factual controversies exist for the Court's resolution. First, the Defendant alleged that sometime after he was arrested and placed in the back seat of Nations's cruiser, but before Deputy Acker arrived with Belu, Officer Nations opened the front passenger side door of the Defendant's vehicle, kneeled on the ground, engaged in a brief search of the front passenger area and floorboard, and then closed the door. The Defendant also alleged that Nations opened the trunk of the Defendant's vehicle, looked inside, and possibly left it open purposefully in anticipation of the dog sniff. These factual allegations are supported by the testimony of Martha Braden. [Tr. 109, 111]. The Government denied these allegations and pointed to the testimony of Officer Nations, Deputy Acker, and Assistant Chief Woods to support its contention that the police did not examine or approach the Defendant's vehicle at all during the period of time between the arrest of the Defendant and the arrival of Deputy Acker and Belu.

Second, the Defendant alleged that during the drug detection sniff of his vehicle, Belu was allowed to enter the interior of the vehicle through the front driver's side door which had been purposefully opened or left open so as to permit the dog easy access. The Defendant also alleged that Deputy Acker coached or enticed Belu to enter the interior of the Defendant's vehicle and then cued him to alert. These allegations are supported by the testimony of Martha Braden. Mrs. Braden testified that she observed Belu enter the Defendant's vehicle through the open front driver's side door. [Tr.110-112]. She also testified that she saw Deputy Acker holding something in his hand while he led Belu around the Defendant's vehicle. [Tr. 111]. The Government denied these allegations and asserted that Belu entered the interior of the Defendant's vehicle by jumping on his

6

own accord through the open front driver's side window of the vehicle. The Government alleged that Deputy Acker followed the proper procedures dictated by his training and did not command or entice Belu to enter the Defendant's vehicle or cue him to alert.

## II. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. The basic rule for addressing the reasonableness of a warrantless search is that "searches conducted outside the judicial process, without prior approval by a judge or magistrate, are *per se* unreasonable under the Fourth Amendment–subject only to a few specifically established and well-delineated exceptions." Arizona v. Gant, 129 S.Ct. 1710, 1716 (April 21, 2009) (quoting Katz v. United States, 389 U.S. 347 (1967)). Two such exceptions are implicated in this case. First, the Defendant argued that police searched his vehicle after he was arrested but before the K-9 team arrived, and that this search cannot be justified as being within the recognized search incident to arrest exception to the warrant requirement. See Gant, 129 S.Ct. at 1716-1721 (containing a discussion of the history of the search incident to arrest exception); see also Weeks v. United States, 232 U.S. 383, 392 (1914) (stating that the right of the Government to search the person of an accused when he is legally arrested was "always recognized under English and American law" and had been "uniformly maintained in many cases"). Second, the Defendant argued that the drug dog sniff of his vehicle was conducted improperly and therefore could not have lawfully provided probable cause to justify searching the vehicle without a warrant pursuant to the recognized automobile exception to the warrant requirement. See United States v. Mans, 999 F.2d 966, 969 (6th Cir.), cert. denied, 510 U.S. 999 (1993) (when "police have probable cause to believe that a vehicle contains contraband they may search the entire vehicle and any contents located within it"); Pennsylvania v. Labron, 518

7

U.S. 938, 940 (1996) ("if a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment thus permits police to search the vehicle without more"). The Court addresses the Defendant's two arguments in turn.

## A. Police conduct before the drug detection sniff

The Defendant argued that the testimony of Martha Braden at the suppression hearing proved that police searched the Defendant's car to some degree prior to the drug detection sniff conducted by Deputy Acker and Belu. The Defendant alleged that Officer Nations believed that he had the legal right to search the interior cabin of the Defendant's vehicle pursuant to the search incident to arrest exception to the warrant requirement. The Defendant further alleged that Officer Nations did in fact conduct a search of the interior cabin of his vehicle shortly after he was arrested and placed in the back seat of Nations's cruiser. The Defendant argued that this search violated the Fourth Amendment because it did not fall within the search incident to arrest exception to the warrant requirement under the holding in Gant. Because the Defendant's arrest occurred on March 21, 2009, one month before the Gant decision was handed down, the Defendant's argument necessarily requires the Court to address the question of whether Gant's interpretation of the search incident to arrest exception applies retroactively.

In United States v. Lopez, 567 F.3d 755, 757 (6th Cir. 2009), the Court of Appeals for the Sixth Circuit conclusively applied Gant's articulation of a permissible search incident to arrest when reviewing a police search of a vehicle that occurred more than two years before Gant was decided by the Supreme Court. In Lopez, the Court of Appeals reviewed a police search of the interior of a vehicle that occurred immediately after the arrest of the vehicle's driver on September 27, 2006. Lopez, 567 F.3d at 755. The court expressly declined to apply the holding of New York v. Belton,

8

453 U.S. 454 (1981)[2], which was the controlling law at the time of the search, and stated simply that "the Supreme Court has since changed the law." Id. at 757. Lopez thus dictates that, in this Circuit, Gant applies retroactively to searches that occurred before it was handed down on April 21, 2009. The Court will therefore review any police search of the Defendant's vehicle that occurred prior to the dog sniff in this case for compliance with the holding in Gant.

In Gant, the Supreme Court held that "police may search a vehicle incident to a recent occupant's arrest only if the arrestee is within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence of the offense of the arrest." Gant, 129 S.Ct. at 1711. In this case, if the Defendant's factual allegations are true, then Officer Nations's conduct in opening the trunk and front passenger door of the Defendant's vehicle and searching the front passenger seat area and floorboard before the arrival of the K-9 team was a clear violation of the Fourth Amendment as interpreted by Gant. Officer Nations arrested the Defendant pursuant to a warrant on charges of telephone harassment. Nations obviously had no reason to believe that the Defendant's vehicle contained any evidence of the offense of the arrest. Nations's opening of the door and trunk and his search of the front passenger seat area are alleged to have occurred *after* the Defendant was handcuffed and seated in the back of Nations's cruiser, so the Defendant clearly was not within reaching distance of the interior of his car. Further, there is no

---

[2] In Belton, the Supreme Court held that "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of the arrest, search the passenger compartment of that automobile." Belton, 453 U.S. at 460. In Lopez, the Court of Appeals expressly recognized that Belton, "by its terms," permitted the search at issue. 567 F.3d at 757. The court then went on to hold that the search "violated the Fourth Amendment as interpreted in Gant." Id. at 758.

evidence indicating that the Defendant ever posed any threat to Officer Nations' safety.[3]  Nations

testified that the Defendant was immediately cooperative and his report of the arrest indicates the

same.  [Tr. 46 and Exhibit 13].  Before Deputy Acker and Belu arrived at the Braden's driveway,

there was absolutely nothing to provide probable cause for a search of the Defendant's vehicle once

the Defendant was handcuffed and seated in the back of Nations's cruiser.  Indeed, the Government

did not offer any evidence tending to show probable cause, nor did it advance any argument that

Officer Nations had any reason at all to search the vehicle.  Instead, the Government stood solely on

its allegation that neither Officer Nations nor any other police officer examined or approached the

Defendant's vehicle at all during the period of time between the arrest of the Defendant and the

arrival of Deputy Acker and Belu.

     The question for the Court is therefore one of fact.  At the suppression hearing, the Defendant

had the burden of proving by a preponderance of the evidence that police unlawfully searched his

vehicle before it was subjected to a drug detection sniff.  See United States v. Blakeney, 942 F.2d

1001, 1015 (6th Cir. 1991) ("in the context of a motion to suppress, the moving party has the burden

of establishing that the evidence was secured by an unlawful search"(citing United States v.

Freeland, 562 F.2d 383, 385 (6th Cir.), cert. denied, 434 U.S. 957 (1977))); United States v.

Thompson, 409 F.2d 113, 117 (6th Cir. 1969) ("The movant has the obligation to present evidence

in court (as opposed to by affidavit) designed to convince the court that his motion should be

granted.  Once he has presented a prima facie case of illegal search, the Government must assume

---

[3] The Court makes particular mention that the Defendant posed no threat because the Supreme Court has stated that the search incident to arrest exception to the warrant requirement "derives from interests in officer safety and evidence preservation that are typically implicated in arrest situations."  Gant, 129 S.Ct. at 1716 (citing United States v. Robinson, 414 U.S. 218, 230-234 (1973)).

a burden of proof that any search made was lawful."(internal citations omitted)); United States v. Wright, 468 F.2d 1184, 1186 (6th Cir. 1972) ("As is true in so many other situations, the burdens of persuasion and of producing evidence in motions for the suppression of evidence have been badly confused. The burden of persuasion is properly and permanently placed upon the shoulders of the moving party. When a criminal defendant claims the right to protection under an exclusionary rule of evidence, it is his task to prove his case." (quoting Rogers v. United States, 330 F.2d 535, 542 (5th Cir. 1964))); Nardone v. United States, 308 U.S. 338, 341 (1939) (stating that "the burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction" that there was actually some unlawful police action to obtain evidence); United States v. Matlock, 415 U.S. 164, 178 n. 14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence" (citing Lego v. Twomey, 404 U.S. 477, 488-489 (1972))). When a defendant claims that an unlawful search occurred and the Government responds that no search, lawful or unlawful, occurred *at all*, the defendant bears the burden of making a prima facie factual showing that the police in fact took some action that rose to the level of a search within the meaning of the Fourth Amendment. In this case, the Court finds that the Defendant failed to carry that burden.

At the hearing, the Defendant primarily relied on the testimony of Martha Braden to prove that Officer Nations opened the trunk and front passenger door of the Defendant's vehicle and searched the front passenger seat area and floorboard *before* the arrival of the K-9 detection team. [Tr. 109-111]. The Defendant also pointed to a photograph of the Braden's driveway taken sometime after the Defendant's arrest depicting the Defendant's vehicle with the hood and the front driver's side door open [Exhibit 4] to suggest that police had clearly made some search of the

vehicle. However, the Defendant did not establish when the photograph was taken or by whom it was taken. The Defendant produced no evidence whatsoever that the photograph depicted his vehicle *before* the drug dog sniff was conducted. Further, Assistant Chief Woods specifically testified that the photograph was taken *after* the drug dog sniff and subsequent search were completed. [Tr. 27].

To support its competing factual allegations, the Government offered consistent testimony from Officer Nations, Assistant Chief Woods, and Deputy Acker that no search of the vehicle took place before the drug detection sniff conducted by Acker and Belu.[4] Officer Nations testified that after arresting the Defendant, he stood by in the Braden's driveway for approximately ten minutes and conducted no other activities with the possible exception of conducting a routine check of the Defendant's driver's license and registration on the computer in his cruiser. [Tr. 47-48, 59, 61]. The Defendant attempted to cast doubt on this testimony by arguing vaguely that merely "standing by" after making an arrest of the occupant of a vehicle without at least walking around the vehicle and looking through the windows to see any items in plain view would have been contrary to Nations's police training and intuition. But Officer Nations specifically testified that he did not approach the Defendant's vehicle because he was waiting for the arrival of a canine drug detection team and he did not want to "contaminate" the vehicle. [Tr. 59, 60, 65, 68]. He also testified that he believed

---

[4]    Deputy Acker testified that when he arrived at the Braden's driveway to begin his drug detection sniff with Belu, the doors of the Defendant's vehicle were closed as were the trunk and the hood. [Tr. 76-77]. Assistant Chief Woods also testified that when he parked on Wyoming Lane in front of the Braden's driveway, he observed that the doors and the hood of the Defendant's vehicle were closed. [Tr. 27]. Officer Nations directly testified that he did not engage in *any* search of the Defendant's vehicle, whether characterized as a "search incident to arrest" or otherwise, before Belu's alert. [Tr. 48, 59, 61, 69]. He also testified that he did not open the hood, trunk, or front passenger side door of the Defendant's vehicle. [Tr.59, 62].

12

that he did not have probable cause to search the Defendant's vehicle prior to Belu's alert. [Tr. 55]. He stated that if he had believed that there was probable cause for a search, he would have searched the vehicle immediately and not waited for the arrival of the drug dog. [Tr. 55, 62]. Nations also stated that he was aware that Martha Braden was watching the events on her driveway from her vantage on her front porch. [Tr. 51-52].

The Court notes that Officer Nations's explanation for his behavior is intuitively appealing. It would make little sense for a police officer who knows that a drug dog is en route to the scene of an arrest to jeopardize the potential for lawfully discovering evidence by going ahead with a search immediately, especially when he also is aware that his conduct is being watched by a civilian bystander. However, the Court is wary of the danger of assuming that a person acted in a certain manner simply because it would have been imprudent for him to have acted otherwise. The Court's decision is therefore based on its opinion that the testimony given by Officer Nations, Assistant Chief Woods, and Deputy Acker was more credible than that given by Mrs. Braden.

The Government successfully cast doubt on the credibility of Mrs. Braden's testimony by establishing during cross examination that she may have had some cause to oppose the testimony given by the police officers, particularly Officer Nations. Braden testified that sometime before the events surrounding the Defendant's arrest on March 21, 2009, Officer Nations had beaten her twenty-year-old son with a "blackjack." [Tr. 123]. Braden testified that she had known the Defendant for three or four years prior to his arrest in her driveway. [Tr. 115]. She stated that the Defendant was a friend of her husband, Gary Braden, and that he had probably been to her home on more than 50 occasions. [Tr. 120]. Braden also testified that police operations had frequently been carried out at her home and on her property and that she told police during the arrest of the

13

Defendant that she was "tired of people going to jail in my yard." [Tr. 108, 119, 121-124].

The Defendant argued unpersuasively that the police officers were essentially engaged in a concerted effort to lie in order to secure a conviction. On cross examination of Officer Nations, the Defendant was able to establish *at most* that Nations believed that the Defendant was likely to have drugs in his vehicle and that Nations wanted to arrest the Defendant on the outstanding telephone harassment warrant in part because he wanted to gain an opportunity to see if the Defendant was in possession of illegal drugs.[5] The Court finds that Nations's belief that the Defendant might have drugs and his motivation to execute the arrest warrant do not cast doubt on his testimony. The Defendant was not able to persuasively establish that any of the police officers had a motive to lie. The Defendant was only able to point to some minor inconsistencies in the testimony offered by the three police officers relating to the specific details of the drug detection sniff.[6] The Court finds that

---

[5] The Defendant played portions of taped transmissions between Officer Nations and the 911 dispatcher at the Anderson County Emergency Communications Office [Exhibits 1 and 2] in which Officer Nations was heard to refer to the Defendant's outstanding arrest warrant as "a bullshit warrant" and to suggest that he thought it was likely that the Defendant had drugs in his car. Officer Nations also testified that he was interested in finding drugs on the Defendant if it happened during a valid arrest pursuant to a warrant. [Tr. 59].

[6] Assistant Chief Woods testified that he did not see the details of Belu's deployment because, due to his training, he backed away from the scene when "the dog [was] pulled." [Tr. 29]. Officer Nations testified that he viewed the deployment of Belu and Belu's path around the Defendant's vehicle. [Tr. 48-49]. Nations testified that he saw Belu start at the front of the vehicle, walk along the passenger's side, and then turn around and walk along the driver's side before jumping through the open front driver's side window. [Tr. 48-49]. Nations also testified that he did not see at any point exactly "what was going on with the dog inside the car." [Tr. 49] Nations stated that the hood and all of the doors of the Defendant's vehicle were closed at the time Belu was deployed. [Tr. 61-62, 70-71]. Deputy Acker testified that Belu was "set up" in front of the Defendant's vehicle and then he "worked" the front of the vehicle and then walked down the driver's side of the vehicle until he reached the rear driver's side door, at which point he turned around and walked back to the front driver's side door. [Tr. 85-89]. Acker stated that Belu then "bounced once" and jumped into the vehicle through the open front driver's side window. [Tr. 85-89]

14

these inconsistencies are immaterial and that they are not sufficient to cast doubt on the overall truthfulness of the officers' testimony.

The Court finds that Martha Braden was effectively impeached and that her testimony was less credible than the testimony given by the police officers. The Court therefore finds that Mrs. Braden's factual assertions did not overcome the contrary factual assertions made by the police officers. Accordingly, the Court concludes that the Defendant did not prove by a preponderance of the evidence that police took any action that rose to the level of a search within the meaning of the Fourth Amendment *before* the drug detection sniff.

## B. The drug detection sniff

The Defendant's second argument for suppressing the evidence in this case is that the dog sniff that was performed on his vehicle was conducted improperly and therefore could not lawfully have provided probable cause that the police needed in order to search the Defendant's vehicle under the automobile exception to the warrant requirement. The Government responded at the hearing by rejecting all factual allegations that the drug detection sniff was conducted improperly.

Police may search the entirety of an automobile and any contents located within it without a warrant when they have probable cause to believe that the automobile contains contraband. United States v. Mans, 999 F.2d 966, 969 (6th Cir.), cert. denied, 510 U.S. 999 (1993); see also California v. Acevedo, 500 U.S. 565, 580 (1991); United States v. Lumpkin, 159 F.3d 983, 986 (6th Cir. 1998). An automobile's ready mobility is "an exigency sufficient to excuse failure to obtain a search warrant once probable cause to conduct a search is clear." Labron, 518 U.S. at 940 (citing California v. Carney, 471 U.S. 386, 390-391 (1985)). Further, an individual has a reduced expectation of privacy in an automobile, owing to pervasive regulation of automobile ownership and operation.

15

Id. If it is clear that a car is readily mobile and that probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more. Id.

The Supreme Court has held that a drug detection sniff of items located in a public place is not itself a "search" within the meaning of the Fourth Amendment. United States v. Place, 462 U.S. 696, 707 (1983). The Court of Appeals for the Sixth Circuit has clarified that "a canine sniff is not a search within the meaning of the Fourth Amendment" no matter where it occurs, as long as the canine team is "lawfully present at the location where the sniff occurs." United States v. Reed, 141 F.3d 644, 650 (6th Cir. 1998). Whether a canine team is lawfully present at a location depends on whether the individual whose property is to be subjected to a drug detection sniff has a reasonable expectation of privacy in that location. See United States v. Diaz, 25 F.3d 392, 396-397 (6th Cir. 1994) (finding that drug agents using trained dogs to sniff out drugs in a motel parking lot were lawfully present on the parking lot because "the motel guests had no reasonable expectation of privacy in the [lot]"). Many cases have established that law enforcement officers can lawfully be present on private residential driveways for at least some limited investigative purposes because a resident has a reduced expectation of privacy in his driveway, especially to the extent that it is readily visible and accessible to the public. See, e.g., United States v. Smith, 783 F.2d 648, 651 (6th Cir. 1986) ("Whether a driveway is protected from entry by police officers depends on the circumstances. The fact that a driveway is within the curtilage of a house is not determinative if its accessibility and visibility from a public highway rule out any reasonable expectation of privacy." (internal citations omitted)); United States v. Magana, 512 F.2d 1169, 1170-1171 (9th Cir. 1975) (holding that "a driveway is only a semiprivate area" and that the test of whether law enforcement officers could lawfully be present on a driveway "should be that of reasonableness, both of the possessor [of the

16

real estate]'s expectations of privacy and of the officers' reasons for being on the driveway"); United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (holding that a private driveway was not protected from a police officer's desire to enter upon it and take photographs because it "provides access to and from the public highway for the occupants and their invitees and members of the public contacting the occupants for business or social purposes and for police or fire protection. The absence of a closed or blocked gate in this country creates an invitation to the public that a person can lawfully enter along the driveway during daylight hours to contact the occupants for a lawful request and if the request is refused to leave by the same way."). Further, the Court of Appeals for the Sixth Circuit has conclusively stated that a resident's short-term guest has "no reasonable expectation of privacy in the driveway of [the residence]" or while present on any other part of the resident's property. United States v. Papierz, 2009 WL 2382189 at *5 (6th Cir. 2009); see also United States v. Berryhill, 352 F.3d 315, 317 (6th Cir. 2003) ("a casual transient visitor does not have a reasonable expectation of privacy in his host's home")). Because a guest has no reasonable expectation of privacy in his host's driveway, he cannot properly argue that a canine team was unlawfully present on that driveway.

In this case, the Defendant conceded at the suppression hearing that Deputy Acker and Belu were lawfully present on the Braden's driveway. The Court accordingly finds that the drug detection sniff performed on the Defendant's vehicle was not itself a search within the meaning of the Fourth Amendment. The question that remains is whether Belu's alert on the Defendant's vehicle was sufficient to provide Deputy Acker, Officer Nations, and Assistant Chief Woods with probable cause to search it. The Defendant argued that Belu's alert on the vehicle could not have provided probable cause because it was "cued" (elicited by improper coaching or encouragement by Deputy Acker)

17

merely to provide a pretext for a search that the police officers had already decided to carry out. The Government did not argue that any other basis for probable cause existed to justify the search and instead relied solely on its contention that the drug detection sniff was carried out properly.

When a warrantless search has occurred, the Government bears the burden of proving by a preponderance of the evidence that it was justified under one of the recognized exceptions to the warrant requirement. See Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971); United States v. Oliver, 686 F.2d 356, 371 (6th Cir. 1982) ("the burden rests on the Government to establish that a warrantless search was conducted within the narrow confines of an established exception to the Fourth Amendment"); United States v. Matlock, 415 U.S. 164, 178 n. 14 (1974) ("the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence" (citing Lego v. Twomey, 404 U.S. 477, 488-489 (1972)). In this case, the Government asserted that the search of the Defendant's vehicle fit within the automobile exception, and therefore the Government bore the burden of proving at the suppression hearing that probable cause existed. An alert by a properly-trained drug detection dog is sufficient to establish probable cause for the presence of a controlled substance. United States v. Navarro-Camacho, 186 F.3d 701, 706 (6th Cir. 1998); see also United States v. Page, 154 F. Supp. 2d 1320, 1326 (M.D. Tenn. 2001) (characterizing this holding as well-settled). For an alert to support a determination that probable cause existed for a search, the Government must prove the training and reliability of the dog. See Diaz, 25 F.3d at 394 ("for a positive dog reaction to support a determination of probable cause, the training and reliability of the dog must be established"); United States v. Huerta, 247 F. Supp. 2d 902, 908 (S.D. Ohio 2002) (placing the burden of proving a drug dog's training and reliability on the Government and applying a "preponderance of the evidence" standard); United

States v. Lambert, 351 F. Supp. 2d 1154, 1162 (D. Kan. 2004) (holding that in "proving probable cause to search the defendant's pickup, the Government must prove that the dog was trained and certified at the time of the alert"); United States v. Neatherlin, 66 F. Supp. 2d 1157, 1161 (D. Mont. 1999) (finding that the Government has the burden of proving a drug dog's reliability).[7]  The Court construes the Defendant's contention that Belu was cued to be an argument against the dog's reliability.  Ultimately, the Government had the burden of overcoming this argument and proving by a preponderance of the evidence that Belu was reliable.

The only evidence that the Defendant offered to support his factual allegations that Belu was coached, encouraged, or enticed to enter the Defendant's vehicle through the front driver' side door that had been purposefully opened or left open and that Belu was cued to alert is the testimony of Martha Braden. Mrs. Braden testified that when Belu and Deputy Acker approached the Defendant's vehicle, both front doors and the trunk were open. [Tr.110].  Mrs. Braden also testified that Deputy Acker held Belu's leash in one hand and squeezed something else in his other hand with which he was "luring" Belu.  [Tr. 111].  She explained that Deputy Acker put his hand (presumably the hand in which he was squeezing an object) inside the open front driver's side door of the Defendant's vehicle and only then did Belu jump into the vehicle. [Tr. 111].  Braden stated that Deputy Acker gave Belu whatever he had been squeezing in his hand after Belu alerted.  [Tr. 111].  Aside from this

_____

[7]  The Court notes that it has not located, nor have the parties cited, any Court of Appeals for the Sixth Circuit precedent that expressly places the burden of proving a drug dog's training and reliability by a preponderance of the evidence squarely on the Government.  However, as the Government bears the burden of proving by a preponderance of the evidence that a warrantless search is within an exception to the warrant requirement, it logically follows that the Government should bear the same burden with respect to proving a drug dog's training and reliability, since those elements are necessary prerequisites to a finding that probable cause stemmed from an alert.  This logic, together with the cited persuasive authority provided by several district courts, leads the Court to conclude that its interpretation of Diaz is correct.

testimony, the Defendant offered no evidence at the hearing to indicate that Belu was cued or otherwise unreliable. The Defendant instead merely urged the Court to infer that Deputy Acker's conduct was improper based on Mrs. Braden's testimony.

The Government rejected Mrs. Braden's testimony as incredible and pointed to Deputy Acker's testimony to establish that Belu was reliable and that the alert was not cued. Deputy Acker testified that he did not see Mrs. Braden on her porch at any point during the conduct of his drug detection sniff with Belu. [Tr. 97-98, 101]. He testified that he did not remember seeing any civilians at all during the sniff. [Tr. 97-98, 101]. Deputy Acker also testified that when he arrived at the Braden's driveway to begin his drug detection sniff with Belu, the doors of the Defendant's vehicle were closed as were the trunk and the hood. [Tr. 76-77].

Deputy Acker explained that Belu was "set up" in front of the Defendant's vehicle and then he "worked" the front of the vehicle. [Tr. 85]. Acker stated that Belu then walked down the driver's side of the vehicle until he reached the rear driver's side door, at which point he turned around and walked back to the front driver's side door. [Tr. 85-89]. Acker testified that Belu then "bounced once" and jumped into the vehicle through the open front driver's side window. [Tr. 85-89]. Acker's testimony was clear that Belu jumped through the window of his own accord. [Tr. 88]. Deputy Acker denied having anything in his hands besides Belu's leash during the drug detection sniff of the Defendant's vehicle. [Tr. 92]. He stated that he did have a tennis ball on a string in his back pocket to reward Belu after a correct alert. [Tr. 92]. Officer Nations's testimony that he observed Belu jump right through the open driver's side window without hesitating is broadly consistent with Deputy's Acker's statements. [Tr. 67]. Nations's testimony that the hood and all of the doors of the Defendant's vehicle were closed at the time Belu was deployed is also consistent.

20

[Tr. 61-62, 70-71].

The Court notes that Deputy Acker testified that it is not unusual for Belu to jump through open windows as a way of entering a vehicle that is being sniffed in order to get as close as he possibly can to the source of an odor before going into an alert. [Tr. 88, 93-96]. Deputy Acker stated: "I try to get people to shut their windows before I run the dog. In this case, the suspect was in custody so I couldn't let him out to close his window." [Tr. 94]. Deputy Acker estimated that Belu jumps through an open car window during approximately 10 percent of his deployments to sniff automobiles.[8] [Tr. 94].

As stated in part (A), *supra*, of this Report and Recommendation, the Court believes the testimony of Deputy Acker and Officer Nations to be more credible than that of Martha Braden. The Government successfully cast doubt on the credibility of Mrs. Braden's testimony by establishing that she may have had a motive to oppose the testimony offered by the police. Further, with respect to the specifics of Belu's deployment, Mrs. Braden's vantage on her porch was much further away from the dog than the vantages of Deputy Acker and Officer Nations. The Court accordingly finds that the testimony of Martha Braden did not overcome the contrary testimony of the police officers and that the Government has carried its burden of proving that Belu was not cued or otherwise improperly instructed or deployed.

In order to carry its overall burden of proving that Belu was reliable and properly and

---

[8]  Late-filed Exhibit 11, "Packet of K-9 Incident Reports on all positive alerts by canine Belu," indicates that Deputy Acker and Belu deployed for a drug detection sniff of a vehicle on 26 occasions between May 5, 2008 and July 29, 2009. Deputy Acker recorded that Belu jumped through an open window during a vehicle sniff only twice, representing 7.7 % of the total number of his vehicle sniff deployments over the 14 month period covered by Exhibit 11. While 10% is not 7.7%, it is certainly a good ballpark estimation. The Court finds that Exhibit 11 broadly supports Deputy Acker's testimony.

sufficiently trained, the Government needed to produce evidence showing as much. The Court of Appeals for the Sixth Circuit has indicated that testimony alone is enough to establish a dog's reliability in order to support a valid drug detection sniff. Diaz, 25 F.3d at 396. To prove reliability, the Government is not required to show that a dog is one hundred percent accurate. United States v. Boxley, 373 F.3d 759, 761 (6th Cir. 2004). Instead, the Government is initially only required to produce evidence that establishes that a dog is generally qualified. Diaz, 25 F.3d at 394 ("when the evidence presented, whether testimony from the dog's trainer or records of the dog's training, establishes that the dog is generally certified as a drug detection dog, any other evidence, including the testimony of other experts, that may detract from the reliability of the dog's performance properly goes to the 'credibility' of the dog"); Boxley, 373 F.3d at 761 ("after it is shown that the dog is certified, all other evidence relating to his accuracy goes only to the credibility of the testimony, not to the dog's qualifications").

In this case, Deputy Acker provided extensive testimony explaining Belu's certifications and training history. [Tr. 77-85]. Acker testified that he and Belu had been certified by the National Narcotic Detective Dog Association for detection of the odor of narcotic. [Tr. 79]. He also specifically stated that Belu had been certified for detecting methamphetamine. [Tr. 84]. In addition to Acker's testimony, the Government also supplied a 70 page packet of documents pertaining to Belu's certifications and training. [Exhibit 10]. The Defendant did not challenge the sufficiency or the propriety of Belu's training. The Defendant also did not object to Belu's general reliability.

The Court accordingly finds that the Government carried its burden of proving Belu's training and reliability by a preponderance of the evidence. Therefore the Court concludes that Belu's alert on the Defendant's vehicle established probable cause for the police to believe that the

22

vehicle contained a controlled substance.  Because the police had probable cause and the Defendant's vehicle was readily mobile, a subsequent search of the vehicle was permitted without a warrant.

## III.  CONCLUSION

After carefully considering the evidence introduced during the course of the suppression hearing and after reviewing the relevant legal authorities, the Court finds that the search of the Defendant's vehicle was a lawful search within the recognized automobile exception to the warrant requirement.  As a result, no evidence in this case shall be excluded for having been obtained in violation of the Fourth Amendment.  Therefore, it is **RECOMMENDED** that the Defendant's Motion to Suppress [**Doc. 11**] be **DENIED**.[9]

Respectfully Submitted,


ENTER:

   s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[9]Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see  United States v. Branch, 537 F.3d 582, 587 (6th Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).